**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X
VILLAGE OF HARRIMAN,

*Plaintiff,*

-*against* -

NEPERA, INC. CAMBREX CORP., and ELT HARRIMAN, LLC.

*Defendants.*

-------------------------------------------------------------------X

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, **VILLAGE OF HARRIMAN**, by and through its attorneys Napoli Shkolnik, PLLC, hereby file this Complaint and makes these allegations based on information and belief and/or which are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery against Defendants, NEPERA, INC., CAMBREX CORP., and ELT HARRIMAN, LLC, pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a)(1)-(4), allege as follows:

## INTRODUCTION

1. This is a civil action for the recovery of response costs pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675. Plaintiffs seek to recover from Defendants, pursuant to CERCLA, 42 U.S.C. §§ 9607(a) & 9620(a)(1), the costs incurred, and to be incurred, by Plaintiffs in responding to releases or substantial threats of releases of hazardous substances located in Orange County, New York.

2. The Village of Harriman brings this action against Defendants due to the contamination of its municipal water wells. This contamination stems from the presence of per-

and poly-fluoroalkyl substances (PFAS), specifically including perfluorooctanoic acid (PFOA) and perfluorooctane sulfonate (PFOS), both recognized as toxic chemicals.

3. The Defendants, Nepera, Inc., ELT Harriman, LLC, and Cambrex Corp., have engaged in activities involving PFOA and PFOS, or products containing these substances, at the former Nepera Plant, located at or around 41 Arden House Road, Harriman, NY 10926 (the "Former Nepera Site"). These activities include, but are not limited to, the procurement, transport, application, processing, blending, storage, handling, spillage, disposal, and release of said substances, which subsequently infiltrated the soil and groundwater, eventually migrating and contaminating the Plaintiff's potable water supply.

4. Defendants were aware, or should have reasonably been aware, that these harmful compounds would inevitably permeate the groundwater, severely pollute drinking water wells, render the water unsafe and unusable, and endanger public health and welfare, as has occurred and continues to occur with the Plaintiff's wells.

5. The Village operates a Water Department, responsible for providing public water services to its residents. The Village's water system caters to approximately 5,000 individuals through roughly 850 service connections.

6. The Village sources its water from groundwater extracted from eight wells, including the Plaintiff's Mary Harriman Well 1A supply well ("MH-1A").

7. This action is predicated on the contamination of the Plaintiff's water supply at MH-1A, specifically by PFOA and PFOS originating from the Former Nepera Site.

8. PFOS and PFOA are characterized by their mobility, environmental persistence, bioaccumulation in organisms and humans, and biomagnification within the food chain. These substances are also linked to numerous significant adverse health effects in humans, encompassing

kidney cancer, testicular cancer, elevated cholesterol levels, thyroid disorders, ulcerative colitis, and pregnancy-related hypertension.

9. The Defendants' actions, involving the use and release of PFOA and PFOS into the environment and groundwater from the Former Nepera Site, have resulted in the contamination of the Plaintiff's Well MH-1A.

10. The Defendants held ownership and/or operational control of the Former Nepera Site during the periods when PFOA and PFOS, or products containing them, were used, discharged, disposed of, and/or released.

11. The Defendants were aware, or should have been aware, that the improper use, storage, handling, release, discharge, or disposal of PFOA and PFOS presented a foreseeable risk to sensitive receptors, such as public water suppliers, due to their non-biodegradable nature, ease of waterborne transport, and the high cost of treatment.

12. The contamination of the Plaintiff's MH-1A by PFOA and PFOS is a direct and proximate consequence of the Defendants' actions and omissions.

13. The Plaintiff's damages, stemming from the aforementioned contamination, encompass investigation costs, testing and monitoring expenses, costs associated with the planning, design, and installation of water treatment systems, treatment operation and maintenance costs, infrastructure modifications, engineering fees, and other related expenditures.

14. The Village has been compelled to incur substantial costs for the design, construction, operation, and maintenance of treatment systems to purify the water of the toxic and carcinogenic chemicals, PFOA and PFOS, released from the Defendants' operations at the Site.

15. In addition to the water treatment efforts to remove PFAS, the Village is incurring additional expenses, such as securing alternative water sources and expanding and/or modifying

the existing water distribution system, to ensure a reliable supply of safe drinking water for its residents.

16. The Village will also face ongoing costs for water sampling to detect PFAS for the next century, given these chemicals' persistent nature and their continued impact on the groundwater within the capture zone of MH-1A from the Site.

**JURISDICTION AND VENUE**

17. This Court has jurisdiction over the subject matter of this action pursuant to CERCLA Section 107, 42 U.S.C. § 9607, and 28 U.S.C. § 1331.

18. This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to claim occurred in the Orange County.

19. This case is properly venued in this Court because Defendants owned, used or possessed the Site, also known as the Nepera Plant, in Orange County, and committed a tortious act at the time of the discharge and/or disposal and/or release of hazardous and toxic substances or waste containing PFOA and PFOS at the Site.

20. This case is properly venued in this Court because the actions of the Defendants and the injuries and damages alleged herein all occurred in the County of Orange, New York.

**STANDING**

21. Plaintiffs and Defendants are "persons" under CERCLA. 42 U.S.C. § 9601(21).

22. Plaintiffs have incurred and will incur response costs that are and will be both necessary and consistent with the National Contingency Plan ("NCP"), 40 C.F.R Part 300, in connection with releases or threatened releases of hazardous substances at and from the Former Nepera Site.

23. Plaintiffs' incurrence of response costs entitles them to seek recovery of such costs and other damages incurred by them, pursuant to 42 U.S.C. § 9607(a) & (g), and other applicable federal law.

**PARTIES**

24. The Village of Harriman is a village incorporated in the State of New York located in the County of Orange, State of New York. The Village's supply well MH-1A is contaminated by PFOS and PFOA emanating from the Site within the system from which Plaintiff draws its potable water.

25. Defendants are current and/or former owners and/or operators of the Former Nepera Site, and industrial and commercial area located in the Village of Harriman, New York.

26. Defendant Nepera, Inc. is a New York corporation with its principal place of business at 41 Arden House Road, Harriman, NY 10926, doing business in the State of New York.

27. On information and belief, Defendant Nepera, Inc. was the owner of the former Nepera Site at the time of the disposal of hazardous substances, including PFOA and PFOS.

28. Defendant Cambrex Corporation is a Delaware Corporation with its principal place of business located at One Meadowlands Plaza, East Rutherford, New Jersey 07073, doing business in the State of New York.

29. Defendant Cambrex Corporation was and is a duly organized foreign limited liability company authorized to do business in the State of New York.

30. On information and belief, Cambrex Corporation. was the owner of the former Nepera Site at the time of the disposal of hazardous substances, including PFOA and PFOS.

31. Defendant ELT Harriman LLC is a Missouri Corporation with its principal place of business located at 1650 Des Peres Road, Suite 303, St. Louis, Missouri, 63131, doing business in the State of New York.

32. Defendant ELT Harriman LLC was and is a duly organized foreign limited liability company authorized to do business in the State of New York.

33. On information and belief, ELT Harriman LLC. was the owner of the former Nepera Site at the time of the disposal of hazardous substances, including PFOA and PFOS.

34. Defendants owned and operated the Former Nepera Site at the time of the use, storage, handling, discharge and/or disposal and/or release of hazardous and toxic products containing PFOA/PFOS and are jointly and severally liable for the foreseeable consequences.

## FACTUAL ALLEGATIONS AS TO ALL COUNTS

### A. The Village of Harriman

35. The Village operates a municipal public water system that supplies its residents under NYSDEC Permit ID 3-3340-00045/00003. The existing permit authorizes the withdrawal of water from a total of 11 permitted wells, including the Mary Harriman Well No. 1A (MH-1A).

36. The Village water-supply system operates using two different pressure zones (high-pressure and low-pressure). Three wells service the low-pressure zone and eight wells serve the high-pressure zone. Currently, only 7 of the 11 wells are in service.

37. The wells that are kept out of service are the result of poor water quality. In addition, the system includes a pitless booster station that transfers treated water from the low service area to the high service area. The pitless booster station is used to assist with meeting the water demand in the high service area because four wells in the high service area are out of service.

38. Also, there is a need to operate the North Main well in conjunction with well MH-1A in an interlocked combination to dilute a water quality problem at each well also causes some water-supply issues. Specifically, the North Main well has exceedances of the uranium maximum contaminant level (MCL) and MH-1A has exceedances of the chloride MCL.

39. The discharge from the North Main well and MH-1A were interlocked to dilute the uranium concentration from the North Main well with groundwater from MH-1A and in turn the groundwater from the North Main well is used to dilute the chloride concentration from MH-1A.

**B. <u>The Former Nepera Site</u>**

40. The site of the former Nepera operations is situated within the Harriman Village, located in Orange County, New York. This location can be categorized into two distinct sections: first, a roughly ten-acre area positioned northeast of Arden House Road, which includes an existing parking lot and a lagoon; and second, an approximate nineteen-acre zone situated southwest of Arden House Road, where the original manufacturing structures once stood. Currently, the facility is no longer active.

41. By 2015, all of the original manufacturing buildings had been taken down, with the exception of the pump house, which still remains. The majority of the land is now covered by deteriorated asphalt, the concrete foundations of former buildings, and scattered remnants of demolition.

42. From 1942 until 2005, the Site was utilized for the production of pharmaceutical and specialized chemical products. Historical practices that led to environmental contamination encompassed the disposal of hazardous materials, including storage in drums, the burning of waste in open pits, and various chemical spills that occurred over the years. The site held a permit from the Department for the storage and treatment of hazardous waste generated on-site. These hazardous waste management areas were closed around 2005. Presently, the site is under management through the Inactive Hazardous Waste Disposal Site Remedial Program.

43. The manufacturing of chemicals at the former Nepera site commenced in 1942, under the operation of the Pyridium Corporation. In 1949, Pyridium Corporation merged with Nepera Chemical Company, resulting in the formation of Nepera Chemical Company, Inc. In

1952, Nepera Chemical Company acquired farmland on the site and started the building of wastewater lagoons. These lagoons were used for the disposal of liquid waste from the Harriman plant between 1953 and 1967.

44. The Pyridium Corporation and its associated Nepera Chemical Company continued their operations until 1956, at which point they were acquired by Warner-Lambert Company. In December 1956, Warner-Lambert Company purchased Nepera Chemical Company. Subsequently, Nepera Chemical Company, Inc. was dissolved, and on January 11, 1957, Warner-Lambert re-established the company as Nepera, Inc.

45. Nepera, Inc. was established in 1957 as a subsidiary of Warner-Lambert Company. Warner-Lambert Company maintained ownership and operational control of the site from its acquisition in 1956 until the sale of Nepera in 1976. Nepera, Inc., Warner Lambert Company, and Warner Lambert Company LLC held ownership and operated the site between 1957 and 1976.

46. In 1976, Warner-Lambert divested Nepera to Schering A.G., a West German entity. Nepera Inc. became a fully owned subsidiary of Schering, A.G. of Berlin, Germany. In 1986, Schering sold Nepera to CasChem Group, Inc., based in Bayonne, New Jersey. In 1987, CasChem was rebranded as Cambrex Corporation. Cambrex Corporation (then CasChem Group, Inc.) acquired Nepera, Inc. in 1986.

47. Cambrex sold the former Nepera site to Rutherford Chemicals in October 2003. ELT Harriman, LLC purchased the site from Rutherford Chemicals LLC in November 2007.

48. The site was used to produce a range of products including bulk and fine pharmaceutical chemicals, hydrogels, and industrial chemicals based on pyridine. From September 1945 to May 1957, chemical byproducts were incinerated on the site.

**C. <u>AFFF and PFAS at the Former Nepera Site</u>**

49. Four buildings at the Former Nepera Site were identified by the NYSDEC as locations where "Aqueous Fire Fighting Foam containing PFAS compounds could have been used."

50. These buildings are "the former emergency center (Building 52) where fire equipment was stored, a former fire pump house (Building 26), a former storage building (Building 2A), and the former foam house (Building 72)."

51. Building 72 housed a tank filled with fire-suppressing aqueous foam. This tank was linked by pipes to the facility's tank farms. In case of a fire, the system was designed to release a water and foam mix through a valve-controlled mechanism.

52. The foam was eventually taken off-site when the plant was decommissioned.

53. Importantly, Building 72, the "Foam House" in which "aqueous foam was stored in a tank," was the location near which the highest detection for PFAS compounds PFOA and PFOS were found by the Department of Environmental Conservation.

54. Firefighting foam stored in a tank within Building 72 is "a documented source of PFCs, particularly PFOS, which is the predominant PFC found at the Nepera site." *Timeline of DEC Interaction Regarding Per- and Polyfluoroalkyl Substances (PFAS)* (September 2017).

55. Additionally, "in response to comments from NYSDEC dated May 19, 2020" further soil investigation was proposed for additional "delineation of PFAS compounds in soil around former Building 72 … where SPLP results" identified in NYSDEC's guidance "exceeded the 70 ng/l threshold for PFOS." Exhibit A at 2-1 (March 2020).

56. A large tank in the Foam House stored AFFF containing PFAS. The tank was connected to several tank farms located throughout the Former Nepera Site via underground piping systems.

**D. Nepera's AFFF Training at Mary Harriman Park**

57. Nepera sponsored two training drills in connection with the Former Nepera Site, and upon information and belief, those drills took place in Mary Harriman Park, adjacent to MH-1A. One of the drills was in May 1986, and the other was in 1988.

58. The 1986 drill was a county drill for the entire fire district. Nepera sponsored the 1986 drill and upon information and belief, Nepera's foam was used for training exercises on live fires. The drill was to provide local firefighter with training in the event of an emergency at Nepera. Nepera also put on a training seminar where the firefighters got to use foam to understand how to put out a fire.

59. For the drill, Nepera brought in a propane tanker truck of liquefied petroleum gas. Nepera trained each one of the firefighters on how to suppress the gas with foam so they could get in close to turning it off.

60. Upon information and belief, firefighters for the Village of Harriman participated in training drills at Mary Harriman Park. During these drills, firefighters utilized firefighting foam.

61. Upon information and belief, the firefighting foam was discharged onto the ground during these training exercises at Mary Harriman Park.

62. Upon information and belief, no containment measures were implemented during the training drills to prevent the firefighting foam from spreading or seeping into the ground at Mary Harriman Park.

63. Upon information and belief, no cleanup or remediation efforts were conducted at Mary Harriman Park following the training drills involving firefighting foam.

**E. Phase III Investigation Report**

64. On June 28, 2024, Defendants' engineers authored the Phase III Emerging Contaminants Site Investigation Report, which details the investigation conducted at the former

Nepera Plant Site. The investigation focused on the presence and distribution of PFAS and 1,4-dioxane in the soil, groundwater, and surface water at the site. This investigation was prompted by the detection of PFOA and PFOS in the Mary Harriman Park public water supply well MH-1A.

65. The investigation involved the installation of additional groundwater monitoring wells, soil borings, and the collection of numerous samples for laboratory analysis. The results of the Phase III investigation, along with data from previous investigations (Phase I and II), were used to update the conceptual site model (CSM) and assess the extent of contamination at the site.

66. Soil samples were collected and analyzed for PFAS compounds. The results indicated that PFOS was detected in a significant majority of the samples, with the highest concentrations found in the vicinity of the former foam house (Building 72).

67. Groundwater samples were collected from both new and existing monitoring wells. The results showed widespread detection of PFOS, PFOA, and PFHxS in groundwater. The highest concentrations of PFOS were found in the eastern and southern portions of the site and in Mary Harriman Park. Lower concentrations were observed along the western portion of the site and NYS Route

68. The Phase III report notes that the distribution of PFAS in groundwater suggests the potential for multiple surface sources of PFAS on the site.

69. The area around well OW-6, located at the south-southeast corner of the site, consistently exhibited the highest concentrations of PFOS, PFOA, and PFHxS in groundwater. This area is also associated with elevated soil concentrations of PFOS and the location of the former foam house, suggesting a historical release of PFAS at the surface.

70. Groundwater samples were collected from 52 wells and analyzed for PFAS compounds. PFOS was detected in 94% of the wells, with concentrations exceeding the NYSDEC

ambient water quality guidance value in 45 wells. PFOA was detected in 92% of the wells, with concentrations exceeding the guidance value in 29 wells. PFHxS concentrations were similar to PFOS concentrations in most wells. 1,4-dioxane was not detected in any of the eight wells sampled for it.

**AS AND FOR A FIRST CAUSE OF ACTION**
**COST RECOVERY PURSUANT TO CERCLA § 107(a)**

71. Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

72. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

73. Defendants are "persons" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

74. Defendants are "owners" and/or "operators" within the meaning of Section 101(2) of CERCLA, 42 US.C. § 9601(20).

75. Defendants' Former Nepera Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

76. There have been numerous releases and disposal of hazardous substances at the above facilities within the meaning of Sections 101(22), 101(29) and 101(14) of CERCLA, 42 U.S.C. § 9601(14).

77. The hazardous substances released and/or disposed of at Defendants' facilities have impacted and contaminated the groundwater, including groundwater which supplies Plaintiff's wells.

78. The hazardous substances released and/or disposed of at Defendants' facilities contained PFOA and PFOS.

79. The Plaintiff has incurred and will incur response costs to investigate, test, monitor, install, operate and maintain treatment systems, and take other measures to address the contamination of its property and its drinking water supply with PFAS.

80. Plaintiff's response costs are consistent with the National Contingency Plan, 40 C.F.R. Part 300.

81. Pursuant to Section 107(a) of CERCLA, 42 U.S.C. §9607(a), Defendants are jointly and severally liable for all remedial and response costs incurred and to be incurred by Plaintiff in connection with the contamination of its wells with PFAS.

**AS AND FOR A SECOND CAUSE OF ACTION**
**DECLARATORY JUDGMENT PURSUANT TO CERCLA SECTIONS 9607(A)(4)(B) AND 9613(G)(2)**

82. Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

83. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

84. Plaintiff will continue to incur additional remedial and response costs, including but not limited to costs to investigate, test, monitor, design, install, operate and maintain treatment systems, and take other measures to address the contamination of its property and its drinking water supply with PFAS.

85. Plaintiff's future costs will be consistent with the National Contingency Plan, 40 C.F.R. Part 300.

86. Plaintiff is entitled to a declaratory judgment, pursuant to CERCLA Sections 9607(a)(4)(B) and 9613(g)(2) and 28 U.S.C. §2201(a), holding Defendants responsible for all

further remedial and response costs or damages that will be incurred by Plaintiff in connection with the above claims.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray that the Court enter a declaratory judgment, pursuant to 42 U.S.C. § 9613(g)(2), in favor of Plaintiffs and against Defendants, declaring Defendants jointly and severally liable to Plaintiffs for the response costs incurred to date, and to be incurred in the future, that are or will be consistent with the NCP, in response to the releases or threatened releases of hazardous substances at or about the Former Nepera Site, provide for an award of attorney's fees and costs to Plaintiffs in this action and provide such other relief as the Court may deem just and proper. Any other and further relief as the Court deems just, proper and equitable

## JURY DEMAND

Plaintiff demands a trial by jury of all claims asserted in this Complaint.

Dated: New York, New York
March 6, 2025

Respectfully submitted,
**NAPOLI SHKOLNIK PLLC**

Patrick J. Lanciotti, Esq.
360 Lexington, 11th Floor
New York, New York 10017
(212) 397-1000

Paul J. Napoli, Esq.
1302 Avenida Ponce de Leon
Santurce, Puerto Rico 00907